WILLIAM A. BRADLEY, PLAINTIFF IN ERROR, *vs.* THE WASHINGTON, ALEXANDRIA, AND GEORGETOWN STEAM PACKET COMPANY, DEFENDANTS IN ERROR.

The plaintiff in error had, by an agreement in writing, hired a steamboat to be put "on the route" from Washington, in the District of Columbia, to Potomac creek, until another steamboat, then building, should be prepared, and be put "on the route." The plaintiff in error was the contractor for carrying the mail of the United States, which was carried in a steamboat to Potomac creek; except in winter, when the navigation of the river Potomac was interrupted by ice, when the mail was carried by land. The steamboat so hired was employed in carrying the mail. The ice prevented the use of the steamboat; and the owners claimed, under the contract, the hire of the boat during the time her employment was thus interrupted. The Circuit Court refused to allow parol evidence to be given to show the purpose for which the steamboat was employed, and to explain the meaning of the terms used in the contract, and of other matters conducing to show the meaning of the contract. The Court held that the evidence was admissible.

It is a principle recognised and acted upon as a cardinal rule by all courts of justice, in the construction of contracts, that the intention of the parties is to be inquired into; and, if not forbidden by law, is to be effectuated.

Extrinsic evidence is not admissible to explain a patent ambiguity, that is, one apparent on the face of the instrument; but it is admissible to explain a latent ambiguity, that is, one not apparent on the face of the instrument, but one arising from extrinsic evidence; that is but to remove the ambiguity by the same kind of evidence as that by which it is created.

Extrinsic parol evidence is admissible to give effect to a written instrument, by applying it to its proper subject matter, by proving the circumstances under which it was made; whenever, without the aid of such evidence, the application could not be made in the particular case.

ERROR to the Circuit Court of the United States for Washington County, in the District of Columbia.

This was an action on the case, brought in the Circuit Court, on the 24th December 1834, by the defendants in error. The claim of the plaintiffs was for two thousand seven hundred and sixty-five dollars, alleged to be due on the 7th day of February, 1832, for the hire of the steamboat Franklin, before that time let and delivered by the plaintiffs to the defendant, now the plaintiff in error.

The cause was tried in 1838, and the jury, under the directions of the Court, found a verdict for the plaintiffs. The defendant tendered a bill of exceptions to the opinion of the Court, on the matters in controversy, which was duly signed and sealed. The Court entered a judgment for the plaintiffs, according to the verdict; and the defendant prosecuted this writ of error.

The bill of exceptions stated, that the plaintiffs gave in evidence and read to the jury the following paper, dated 19th November, 1831, signed by William A. Bradley, as follows:

"I agree to hire the steamboat Franklin, until the Sydney is placed on the route, to commence to-morrow, 20th instant at ($35) thirty-five dollars per day, clear of all expenses, other than the wages of Captain Nevitt.　　W. A. BRADLEY.

"19th Nov. 1831."

[Bradley *vs.* The Washington, Alexandria, and Georgetown Steam Packet Company.]

" On the part of the Washington, Alexandria, and Georgetown Steam Packet Company, I agree to the terms offered by William A. Bradley, Esqr. for the use of the steamboat Franklin, until the Sydney is placed on the route to Potomac creek; which is thirty-five dollars per day, clear of all expenses, other than the wages of Capt. Nevitt, which are to be paid by our company.

" W. GUNTON, *President.*

" Washington City, Nov. 19th, 1831."

" PISHEY THOMPSON, Esqr. "*Washington City, Dec. 5th,* 1831.

DEAR SIR—I will thank you to advise the president and directors of Washington, Alexandria, and Georgetown Steam Packet Company, that, the navigation of the Potomac being closed by ice, we have this day commenced carrying the mail by land, under our winter arrangement; and have therefore no further occasion for the steamboat Franklin, which is now in Alexandria in charge of Capt. Nevitt.

The balance due your company, for the use of the Franklin, under my contract with Dr. Gunton, will be paid on the presentation of a bill and receipt therefor. With great respect,

Your obedient servant, W. A. BRADLEY.

" PISHEY THOMPSON, Esqr. Present."

In reply to this letter the president of the Steam Packet Company wrote to the defendant as follows :—

" *Washington, Dec. 6th,* 1831.

" SIR—Your letter of the 5th instant to Mr. Pishey Thompson, has been this afternoon submitted to the board of directors of the Washington, Alexandria, and Georgetown Steam Packet Company, at a meeting holden for the purpose. After mentioning that the navigation of the Potomac is closed by ice, and that you had commenced carrying the mail by land, under your winter arrangement, you have therein signified you have no further occasion for the steamboat Franklin, and that she was then in Alexandria in charge of Captain Nevitt.

" The agreement entered into by you, contains no clause making its continuance to depend on the matters you have designated; but, on the contrary, an unconditional stipulation to "hire the Franklin until the Sydney is placed on the route:" and I am instructed to inform you that the board cannot admit your right to terminate the agreement on such grounds, and regard it as being still in full force, and the boat as being in your charge.

" However disposed the board might have been to concur with you in putting an end to the agreement, under the circumstances you have described, if the company had not been already in litigation with you and your colleague, for the recovery of a compensation for the use of the Franklin under another contract, to the strict letter of which a rigid adherence is contended for on your part, not-

withstanding it had undergone a verbal modification; the board could not but recollect this, and be influenced thereby,

    Yours, respectfully,

"Wм. A. Bradley, Esq."          W. Gunton, *President.*"

The plaintiffs also proved that the steamboat Sydney was in Baltimore in November, 1831, and continued there until the 26th of January, 1832; and that she left there and arrived in the Potomac, and was put "on the route" to Potomac Creek on the 6th of February of that year. She had not been able to start from Baltimore until the 25th January, 1832. The plaintiffs claimed the hire of the Franklin from the 20th of November, 1831, to the 6th day of March, 1832, at thirty-five dollars per day.

The defendant, to support the issue on his part, offered to prove, by competent witnesses, that for several years immediately preceding the date of the contract, he had been, and was still, contractor for the transportation of the United States mail from Washington to Fredericksburg; that the customary route of said mail was by steamboat from Washington to Potomac Creek, thence by land to Fredericksburg, in which steamboat passengers were also usually transported on said route; that during all that time the defendant had used a steamboat belonging to himself on said route; that he also kept an establishment of horses and stages for the transportation of said mail all the way by land from Washington to Fredericksburg, at seasons when the navigation of steamboats was stopped by ice; and had been obliged, for a considerable portion of every winter during the time he had been so employed in the transportation of the mail, to use his said stages and horses for the transportation of the mails all the way by land to Fredericksburg; in the mean time laying up his steamboat. That just before the date of said contract, the defendant's own steamboat, usually employed as aforesaid on said route, had been disabled, and the defendant was at the time about completing a new boat, called the Sydney; which had been built at Washington, and sent round to Baltimore for the purpose of being fitted with her engine, and other equipments necessary to complete her for running on said route; and that she lay at Baltimore, in the hands of the workmen there, at the date of said contract; that on the morning of the 5th day of December, 1831, Captain Nevitt, the commander of the said steamboat Franklin, refused to go on the said route of the defendants to Fredericksburg, in consequence of the ice then forming in the river, unless he was directed to do so by the plaintiffs; that application was then made to Doctor Gunton, the president of the company, and he directed the said captain to proceed as required, and obey the orders of the defendant; that the said captain did then proceed on the said route, and returned as far as Alexandria, where he stopped, and sent up the mail by land; and, although required to do so by the agent of the said defendant, he refused to come up to the city of Washington with the boat, in consequence of the ice which had formed in

the river; and that said boat lay at Alexandria, frozen up in the harbour, from that time till the 5th February, 1832; that at the same time the navigation of the Potomac river became obstructed as aforesaid, the navigation at and from Baltimore became also obstructed from the same cause, and the said steamboat Sydney was also frozen up in the basin at Baltimore, before she had been completely equipped with her engine; that at the time she was frozen up, she wanted nothing to complete her equipment but the insertion of two pipes, a part of her engine, which pipes had been made, but not then put in place, the completing of which would not have required more than two days, and the boat would have been in complete order for being sent round to Washington, and put upon said route; but the ice having interposed, it was deemed by the workmen, and those in charge of the boat, that the insertion of said pipes ought to be postponed till the navigation was clear; that in January, 1832, the said pipes were inserted, and the said boat being completely equipped for her voyage, left Baltimore for Washington, as soon as the state of the ice made it practicable to attempt that voyage; was again stopped by the ice, and obliged to put in at Annapolis, whence she proceeded to Washington as soon as the ice left it practicable to recommence and accomplish the voyage, and arrived at Washington on the 6th February, 1832, and was, the next day, placed by defendant on said route; that during the whole of the period from the first stopping of the navigation as aforesaid, until the said 6th February, the defendant had abandoned the said route to Potomac creek, and prosecuted the land route from Washington to Fredericksburg.

2. That it was known to and understood by plaintiffs, at the time the contract in question was made, and was a matter of notoriety, that as soon as the navigation should be closed by ice, the United States mail from Washington to Fredericksburg would have to be transported all the way by land carriage, instead of being transported by steamboat to Potomac creek, and thence by land to Fredericksburg; and that the said steamboat Franklin would not be required by defendant, and could not be used under said contract when the navigation should be closed.

3. That it was communicated to the plaintiffs by defendant, or his agent, before the time of making said contract, that the defendant intended to keep said steamboat in use under said contract, so long as the navigation remained open, and no longer.

To the admissibility of which evidence the said plaintiffs by their counsel objected, and the Court refused to permit the same to go to the jury; but, at the instance of plaintiffs, gave the following instruction, viz.:—

That if the jury shall believe, from the evidence aforesaid, that the said defendant did, on the 19th day of November, 1831, write to said plaintiffs the said paper of that date, bearing his signature, and that said plaintiff did accept the same by the said paper of the same date, and that said defendant and plaintiffs did respectively

write to each other the papers bearing date the 5th and 6th of December, 1831, and that the said steamboat Sydney did in fact first arrive in the Potomac river on the 6th February, 1832, and was placed on the route to Potomac creek, mentioned in the said evidence, on the 7th February, 1832 ; that then the said plaintiffs are entitled to recover, under said contract so proved as aforesaid, at the rate of thirty-five dollars per diem, from the said 20th November, 1831, to the said 6th of February, 1832, both inclusive.

To which refusal, by the Court aforesaid, to admit the evidence so offered by the said defendant, as also to the granting by the Court of the said instruction aforesaid, so prayed for by the said plaintiffs, the said defendant by his counsel excepted.

The case was argued by Mr. I. H. Bradley and Mr. Jones, for the plaintiff in error ; and by Coxe for the defendants.

The counsel for the plaintiff in error maintained that the evidence offered on his part, and rejected by the Circuit Court, ought to have been admitted, and that it imported a full defence to the action ; and that the terms of the instruction from the Court to the jury were in other respects erroneous and untenable, upon the data assumed in the instruction itself.

The hiring of the Franklin was from day to day. The contract was made under the known circumstances of the case ; and was so understood by all the parties to it. The purpose for which the boat was hired was to convey the mail, for the conveyance of which the plaintiff in error was the contractor ; and it had reference to two circumstances, viz. : one expressed, that the Sydney should be in a condition to be placed on the route, for which it was known she was preparing ; the other, equally well understood, that the interruption and prevention of the running of the steamboat, by the ice in the Potomac, would oblige the contractor to convey the mail by land ; in which case, as the boat could no longer be used, the hiring would cease.

The evidence offered by the plaintiff in error, was to explain, not to contradict the written contract. It was to show what the route for which the boat was employed was ; and that the plaintiff could only use the boat while the river was navigable. It was to show that after the river was closed, the mail was transported by land. Such evidence is admissible by the rules of law. Cited 1 Mason's Rep. 10. 4 Campbell's Nisi Prius. 8 Term Rep. 379. 382. 3 Dall. Rep. 415. 5 Wheat. 326. 8 Johns. Rep. 116. 19 Johns. Rep. 313. 2 Barn. and Ald. 17. 11 East, 212. 2 Bos. and Pull. 503. 10 East, 555. 2 Camp. 627.

According to reason, and analogous cases, there can be no doubt of the propriety and legality of the evidence. We are to look at the terms of the contract, and to the usage of the business in which the Franklin was to be employed. She was to be used in carrying the mail ; and it must have been known that when she could no longer carry the mail, she would not be employed. The preven-

tion by causes not within the control of either party, would excuse both from the performance of the contract.

He who hires, is to have the enjoyment and use of the thing hired. If the hiring is for a specific purpose, the purpose must be accomplished. In this case the hiring was for a public, notorious purpose; and it was well known and well understood, that on certain events occurring, the Franklin would be no longer employed.

Was it an engagement which was to depend for its determination solely on the Sydney's being placed on the route. This would have compelled the plaintiff in error to pay for the Franklin to the end of time, if the Sydney had been burned, or had not been capable of proceeding on the route. The length to which this position would extend proves its error.

Coxe, for the defendants in error, contended, that the engagement to hire the Franklin, was to continue until the happening of a particular event; until the Sydney should be fit to take her place on the route. The suspension of the performance of the boat, could be but temporary; and this was one of the contingencies to which the plaintiff in error had subjected himself by the contract. There is nothing to distinguish this case from the case where an embargo has interposed to suspend the voyage of a ship.

The evidence was properly excluded. The contract was express, plain, and simple; and did not require the testimony. No difficulty existed as to the meaning of the terms used in the agreement. "The route," was well understood. It was not a mail route only, but it was used by the plaintiff in error for the conveyance of passengers; and this was one of the objects of the contract. It was on these principles the Circuit Court proceeded in the case.

Mr. Justice BARBOUR delivered the opinion of the Court.—

This case is brought before us by a writ of error to a judgment of the Circuit Court of the District of Columbia, for the county of Washington.

It was an action of assumpsit, brought by the defendants in error, against the plaintiff in error, to recover a sum claimed for the hire of the steamboat Franklin.

The claim was founded upon a written contract, concluded between the parties, by the following correspondence:—On the 19th of November, 1831, the plaintiff in error wrote to the defendants in error, a note, of which the following is a copy: "I agree to hire the steamboat Franklin until the Sydney is placed on the route, to commence to-morrow, 20th instant, at ($35) thirty-five dollars per day, clear of all expenses other than the wages of Captain Nevitt. W. A. Bradley."

To this note, W. Gunton, as president of the company, replied on the same day, in the following words: "On the part of the Washington, Alexandria, and Georgetown Steam Packet Company, I agree to the terms offered by William A. Bradley, Esq., for the

use of the steam boat Franklin, until the Sydney is placed on the route to Potomac creek, which is thirty-five dollars per day, clear of all expenses, other than the wages of Captain Nevitt, which are to be paid by our company."

Upon the trial of the cause, on issue joined, upon the plea of non assumpsit, a bill of exceptions was taken by the defendant; from which it appears that the plaintiffs in the Court below, having given in evidence the correspondence already stated, further gave in evidence, a note, signed by William A. Bradley, dated December the 5th, 1831, addressed to Pishey Thompson, requesting him to advise the president and directors of the Steam Packet Company, that the navigation of the Potomac being closed by ice, they had that day commenced carrying the mail by land, under their winter arrangement, and had, therefore, no further occasion for the steamboat Franklin, which was then in Alexandria, in charge of Captain Nevitt; and offering to pay the balance due for the use of the Franklin, on the presentation of a bill, and receipt therefor; and also a letter from W. Gunton, addressed to Wm. A. Bradley, dated the 6th December, 1831, in which, after stating that the letter of the fifth, from Bradley to Thompson, had been submitted to the board of directors of the company, he informed him, that the board could not admit his right to terminate his agreement, on the grounds which he had stated in his note to Thompson; and that they regarded it as being still in full force, and the boat as being in his charge. The plaintiff also proved, that the steamboat Sydney was not placed on the route until the 7th of February, 1832; that the Sydney belonged to the defendant, and that she was not finished so as to be able to start from Baltimore, until the 25th of January. And thereupon, the plaintiffs claimed the hire of the steamboat Franklin from the 20th of November, 1831, to the 6th of February, 1832, seventy-nine days, at thirty-five dollars per day; allowing credit for three hundred and fifty dollars, paid by the defendant, and leaving a balance of $2,415.

It appears from the bill of exceptions, that after the plaintiff had closed his evidence, the defendant, amongst other things, offered to prove, that he for several years had been, and then was, contractor for the transportation of the mail, from Washington to Fredericksburg; that the customary route of said mail was by steamboat from Washington to the Potomac creek, thence by land to Fredericksburg, and that passengers were also transported on that route; that he kept an establishment of horses and stages, for the transportation of the said mail all the way by land from Washington to Fredericksburg, at seasons when the navigation of steamboats was stopped by ice; and had been obliged for a considerable portion of every winter, during the time he had been so employed in the transportation of the mail, to use his said stages and horses, for the transportation of the mail, all the way by land to Fredericksburg, in the mean time laying up his steamboat; that just before the date of the contract, the defendant's own steamboat, usually

employed on said route, had been disabled, and the defendant was at the time, about completing a new boat called the Sydney, which had been built at Washington, and sent round to Baltimore for the purpose of being fitted with her engine and other equipments; that in January, 1832, the Sydney, being completely equipped, left Baltimore for Washington, as soon as the state of the ice made it practicable to attempt the voyage, was stopped by ice, and obliged to put in at Annapolis, whence she proceeded to Washington, as soon as the ice left it practicable; arrived at Washington on the 6th of February, 1832, and was on the next day placed by defendant on the route; that on the 5th of December, 1831, Captain Nevitt, the commander of the Franklin, refused to go on the said route of the defendant, in consequence of the ice then forming in the river, unless he was directed to do so by the plaintiffs; that upon application to the president of the company, he directed the captain to proceed as required, and obey the orders of the defendant; that the captain did then proceed on the route, and returned as far as Alexandria, where he stopped, and sent up the mail by land, and although required by defendant's agent, refused to come up to Washington with the said boat, in consequence of the ice which had formed in the river; and that the said boat lay at Alexandria, frozen up in the harbor, from that time to the 5th of February, 1832; that it was matter of notoriety, and known to and understood by the plaintiffs, at the time the contract in question was made, that as soon as the navigation should be closed by the ice, the United States mail from Washington to Fredericksburg would have to be transported all the way by land carriage, instead of being transported by steamboat to Potomac creek, and thence by land to Fredericksburg; and that the steamboat Franklin would not be required by defendant, and could not be used under said contract, when the navigation should be closed.

The Court refused to permit the evidence thus offered by the defendant to go to the jury. And then, on the motion of the plaintiffs, instructed the jury, that if they believed from the evidence, that the defendant wrote to the plaintiffs the paper of the 19th November, 1831, and that the plaintiff accepted the offer, by the same date, and that plaintiffs and defendant respectively wrote to each other the papers bearing date the 5th and 6th December, 1831, and that the steamboat Sydney did in fact first arrive in the river Potomac on the 6th February, 1832, and was placed on the route to Potomac creek, on the 7th of February, 1832, that then the plaintiffs were entitled to recover, under the contract so proved, at the rate of thirty-five dollars per diem, from the 20th of November, 1831, to the 6th of February, 1832, both inclusive.

The questions then arising upon this record, are: first, whether the Court erred in refusing to permit the evidence offered by the defendant to go to the jury? And, secondly, whether they erred in giving the instruction to the jury which they did give, at the instance of the plaintiffs?

[Bradley vs. The Washington, Alexandria, and Georgetown Steam Packet Company.]

As to the first question. It is a principle recognised and acted upon by all Courts of justice, as a cardinal rule in the construction of all contracts, that the intention of the parties is to be inquired into; and if not forbidden by law, is to be effectuated. But the law has laid down certain rules, declaring by what kind of proof in any given case this intention is to be ascertained.

Amongst these rules, a leading one in relation to written contracts, to which class the one in question belongs, is this: That extrinsic evidence is not admissible to explain a patent ambiguity; that is, one apparent on the face of the instrument: but that it is admissible to explain a latent ambiguity; that is, one not apparent on the face of the instrument, but one arising from extrinsic evidence; for this is but to remove the ambiguity by the same kind of evidence as that by which it is created. The rule thus stated seems to be in itself quite plain and intelligible, and yet much difficulty has arisen in its application. The illustration most usually given of the operation of this rule in the admission of extrinsic evidence, is that of a description of a devisee, or of an estate, in a will, where it turns out that there are two persons, or two estates, of the same name and description. These, however, are put, not as measuring the extent of the rule, but as exemplifying its application; and all other cases within the scope of the principle are, in like manner, open to explanation, by the same kind of evidence.

Accordingly it is laid down, in a very accurate writer on the subject of evidence, 3 Starkie, 1021, that extrinsic parol evidence is admissible to give effect to a written instrument, by applying it to its proper subject matter.

Let us examine some of the many cases which have been decided upon the subject of the admissibility of this evidence, in relation to written instruments.

In the first place, wherever there is a doubt as to the extent of the subject devised by will, or demised, or sold, it is matter of extrinsic evidence to show what is included under the description, as parcel of it. Accordingly, in 1 Term Rep. 701, Buller, Judge, said, whether parcel or not, of the thing demised, is always matter of evidence. So where a grantor in a deed described the premises, as the farm on which he then dwelt, this was held to be a latent ambiguity, which might be explained by evidence aliunde; and evidence was admitted, that a particular piece of land, claimed under the deed, was at the time of the grant in a state of nature, unenclosed, and separate from the rest of the farm, and that the grantor remained in possession, and occupied it as his own till his death—to show that it was not within the grant. 4 Dav's Rep. 265.

In 8 John. 116, the case was this: A, by a written contract, agreed to receive of B sixty shares of the Hudson Bank, on which ten dollars per share had been paid, and to deliver B his note for $667, and pay him the balance in cash, and also to pay five per cent. advance. It was decided that this was a case of latent ambiguity, and the nominal value of each share being fifty dollars, parol

evidence was admitted, to show whether the five per cent. advance was to be paid on the sum paid in, only, or on the nominal amount. In 2 Leigh, 630, the principle is laid down by the Court, that parol evidence is not admissible to vary, contradict, add to, or explain a written agreement; but in cases of equivocal written agreements, the circumstances under which they were made may be given in evidence to explain their meaning. In the case of Birch *vs.* Depeyster, 1 Starkie's Cases, 210, the charter party stipulated that the captain should receive a specific sum, in lieu of privilege and primage, and the question was, whether the terms of the contract excluded all right on the part of the captain to use the cabin for the carriage of goods, on his own account. Gibbs, Chief Justice, said: evidence may be received to show the sense in which the mercantile part of the nation use the term privilege, just as you would look into a dictionary to ascertain the meaning of a word; and it must be taken to be used by the parties in its mercantile and established sense.

So where a charter party stipulated that a freighter should pay a certain sum per pound, &c., British weight; it was held, that as the word weight had two meanings, gross and neat, this was such a latent ambiguity as to warrant the introduction of parol testimony. 1 Nott and M'Cord, 45.

In the case of Peish *vs.* Dickson, 1 Mason's Rep. 11, it is said by the judge, that if by a written contract, a party were to assign his freight in a particular ship, it seemed to him that parol evidence might be admitted of the circumstances under which the contract was made, to ascertain whether it referred to goods on board the ship, or an interest in the earnings of the ship; or in other words, to show in what sense the parties intended to use the term.

Nor is this principle at all confined to mercantile contracts; for in Robertson *vs.* French, 4 East, 130, Lord Ellenborough, speaking on this subject, said, that the same rule which applied to all other instruments, applied also to a policy of insurance. The admission of this kind of proof has been carried to a great extent too, with a view to a correct construction of wills. In the case of Shelton's executors *vs.* Shelton, 1 Wash. Rep. 56, it is said, that to discover the intention of a testator, parol evidence may be admitted of his circumstances, situation, connection with the legatees, and his transactions between the making of his will and his death. And this same doctrine is advanced by the same Court, in 3 Hen. and Mun. 283.

We will close this reference to cases with that of the Mechanic's Bank *vs.* The Bank of Columbia, 5 Wheat. 326. In that case, it was held by this Court, that where a check was drawn by a person who was the cashier of an incorporated bank, and it appeared doubtful upon the face of the instrument whether it was an official or a private act, parol evidence was admissible to show that it was an official act; and accordingly, many facts and circumstances were given in evidence, to prove in what character it was drawn.

[Bradley *vs.* The Washington, Alexandria, and Georgetown Steam Packet Company.]

The cases which we have thus collected together from amongst the very many which exist, will serve to show in how many aspects the question of the admissibility of extrinsic evidence in relation to written contracts has been presented and decided; and in how many forms, according to the various circumstances of the cases, the principle which we have been considering has been applied. Sometimes it has been applied to deeds, sometimes to wills, and sometimes to mercantile and other contracts. In some cases it has been resorted to to ascertain which of several persons was intended; in others, which of several estates. In some, to ascertain the identity of the subject; in others, its extent. In some, to ascertain the meaning of a term, where it had acquired by use a particular meaning; in others, to ascertain in what sense it was used, where it admitted of several meanings. But in all the purpose was the same. To ascertain by this medium of proof the intention of the parties, where, without the aid of such evidence that could not be done; so as to give a just interpretation to the contract.

Without attempting to do what others have said that they were unable to accomplish; that is, to reconcile all the decisions on the subject; we think that we may lay down this principle as the just result. That in giving effect to a written contract, by applying it to its proper subject matter, extrinsic evidence may be admitted to prove the circumstances under which it was made; whenever, without the aid of such evidence, such application could not be made in the particular case.

With this principle in view, we proceed to inquire whether the evidence offered by the defendant, in this case, ought to have been received by the Court.

Now had the evidence been received, it would have disclosed the following state of facts. That the route mentioned in the contract, was one on which the plaintiff in error transported passengers, and also the mail: that the steamboat Sydney, mentioned in the contract, was designed to perform this service; and that the Franklin was wanted for the same purpose: that the Sydney was then at Baltimore, for the purpose of being fitted with her engine and equipments: that although the transportation of passengers and the mail was carried on, by the plaintiff in error, in a steamboat, whilst the river was open; yet, when the river was closed by ice, so that navigation was obstructed, the plaintiff in error then transported passengers and the mail all the way over land to Fredericksburg: that when the river was thus obstructed, the plaintiff in error could not, and did not, use a steamboat: and that all these facts were known to the defendants in error.

We think that this evidence ought to have been received, because it would have tended to show, by the circumstances under which the contract was made, what was the intention of the parties; and, in the language of the rule which we have laid down, that the contract, without its aid, could not be applied to its proper subject matter.

The terms used in the written contract are, " for the use of the

steamboat Franklin, until the Sydney is placed on the route to Po-
tomac creek." It is contended, that this amounted to a stipulation
to keep the Franklin in use until the Sydney was placed on the
route; no matter what length of time may have elapsed before that
was done. Suppose that the Sydney had been accidentally con-
sumed by fire the day after the hiring of the Franklin, the effect of
this construction would be, to make that hiring coëxtensive in point
of time with the existence of the Franklin, in a condition for use;
although it is obvious that a temporary hiring only was in the con-
templation of the parties. Again, suppose the plaintiff in error had
sold the Sydney, and bought another boat, and put that other on the
route; the construction contended for would lead to the result, that
the hire of the Franklin would still have continued to have gone on,
indefinitely. If this were so, it must be upon the principle that it
entered into the contemplation of the parties, as a material term of
the contract, that the plaintiff in error should keep the Franklin in
use, not until he ceased to want it by having a steamboat to take its
place, but until the identical steamboat Sydney, and no other, should
take its place. We think that the evidence offered, and rejected by
the Court, would have shown why reference was made to the Syd-
ney being placed on the route; that is, because she was expected
to be ready for use in a very short time. It would have shown
further, that the defendants in error knew the service for which their
boat was wanted; what was the nature of that service; that when-
ever the river was obstructed by ice, the Franklin would not be
wanted, because it could not be used, and because then another
mode of transportation was resorted to. From all this it would
have been competent to infer, that the words, "until the Sydney is
placed on the route," were not intended to fix that time as the
period to which the hiring was to continue, at all events, and under
all circumstances; but as being referred to, because the Sydney was
then expected to be ready for use in a very short time; and so soon
as she could be used, the Franklin would not be wanted, even al-
though there should be no obstruction to navigation by ice. And,
moreover, it would have been competent to infer, that as the defend-
ants knew why the Franklin was wanted; for what service she was
wanted; the character of that service, that is, that it would cease
when she could not be used, by reason of the river being closed
with ice: that, therefore, the real intention of the parties, to be
derived from the written contract and the parol evidence taken to-
gether, was, a hiring and letting to hire, for so long a time as the
boat could be used, that is, until the navigation was obstructed;
subject to being terminated at any previous time, when the Sydney
was ready to take her place. We think that the rule of law, which
admits extrinsic evidence for the purpose of applying a written con-
tract to its subject matter, justifies its admission, beyond the mere
designation of the thing, or corpus, if we may so express it, on
which the contract operates, and extends so far as to embrace the
circumstances which accompany the transaction; when, without the

aid of those circumstances, the written contract could not be applied to its proper subject matter.

This principle is illustrated by the cases which we have before referred to. Take, for example, the case cited from 1 Mason, 11. That was assumpsit for a balance alleged to be due on consignments. In that case, parol evidence was received of the circumstances under which a contract was made, which contained this clause relating to the plaintiff's goods, viz. "On which goods Mr. D. (the defendant in the case) has advanced me $5,833, for which amount he will hold for reimbursement, on the amount and net proceeds of the sales of said goods, which are only considered answerable, for said amount advanced, as per our agreement;" for the purpose of showing, whether it was intended to waive any personal claim on the plaintiff, and to restrict the defendant's security, for the repayment of the advance, to the goods only; or was meant merely to exempt the goods of the shippers, on freight, from being included as a security for the advance on the plaintiff's goods.

So we have seen, in the case from 2 Leigh, 630, the proposition is stated, in terms, that in equivocal written agreements the circumstances under which they were made may be given in evidence, to explain their meaning; and, accordingly, in that case, the judges rely upon the circumstances as disclosed by the parol evidence, in connexion with a written promise of indemnity, in deciding on its legal effect.

We could suggest many cases which we think would illustrate this principle, and prove, that from the necessity of the case, and consistently with the rules of law, the circumstances under which a written contract is made, must be open to proof by extrinsic evidence, in order to ascertain the intention of the parties, and thus correctly interpret it. Suppose that during the late war, a person had been engaged, by contract, to transport munitions of war to the army; that, for that purpose, he had hired a steamboat of another, and had signed a written agreement, by which he engaged to take good care of the boat; suppose that, whilst he was engaged in this transportation, the boat had been destroyed by the enemy, as it might rightfully have been by reason of the hostile character impressed upon it; that, thereupon, a suit had been brought by the person who let it to hire, upon the stipulation to take good care of the boat. Can it be doubted, that it would have been competent for the defendant to have proven, that he was a contractor with the government to transport munitions of war; that he had hired the boat for that express purpose; and that these facts were known to the other party, so as to show the intention and understanding of the parties as to the kind of danger to which the boat would unavoidably be exposed, in performing the very service for which it was hired.

We will state only one case more, founded on the suggestion of Mr. Chief Justice Ellsworth, in a note to 3 Dallas, 421. Suppose a,

I 2

man signs a written agreement in these words, viz., "I will take your ship John." May not the party, as the Chief Justice asked, go beyond the note, to explain, by existing circumstances, the meaning of the word take; which, accordingly as the circumstances might be one way or another, might equally embrace a purchase or a charter party?

All the cases which we have cited, in which extrinsic evidence has been received, and those which we have supposed, in which we think that it would be admissible, proceed on one principle only, and can only be justified upon that principle. And that is this: that the rule which admits extrinsic evidence, for the purpose of applying a written contract to its proper subject matter, extends beyond the mere designation of the thing on which the contract operates; and embraces within its scope the circumstances under which the contract concerning that thing was made; when, without the aid of such extrinsic evidence, such application of the written contract to its proper subject matter could not be made. Hence Mr. Starkie, in his third volume on evidence, 1021, after having laid down the principle, that extrinsic parol evidence is admissible to give effect to a written instrument, by applying it to its proper subject matter; adds, " and also as ancillary to the latter object, (that is, the application to its proper subject matter,) for the purpose, in some instances, of explaining expressions used in a peculiar sense, and of annexing customary incidents," &c.

Let us take a case under each branch of this rule; and by this exemplification, we shall more clearly see the operation of the rule itself, and the very decided bearing which it has upon this case. Then as to the first branch, as to parol evidence for the purpose of explaining expressions used in a peculiar sense. Let us take the case before cited, where the question was as to the legal effect of a written contract, to receive a stipulated sum in lieu of privilege and primage: in other words, what was the meaning of these terms? Parol evidence was received to show the sense in which the mercantile part of the nation used the word privilege; and why? Because, the real question was not what was the meaning of the word privilege in general; if that had been the question, it would have been a patent ambiguity, and parol evidence would have been clearly inadmissible: but the real question was, what was the meaning of the word privilege, as used in that contract; it being a word which had acquired in the mercantile world a peculiar meaning, that meaning must be inquired into, by parol evidence, to get at the intention of the parties, as it was a mercantile contract. Thus, it will be seen, that it was necessary to go into the mercantile sense of the word, that being the sense in which it was used in the case stated; in order to apply the written contract to its proper subject matter. Accordingly, Mr. Starkie, in his book on evidence, 1033, states that to be the reason why evidence is admissible to prove the special and peculiar sense in which a word is understood.

Now, let us take a case to exemplify the second branch of the rule, as to annexing customary incidents. The case of Senior *vs.* Armitage, will illustrate the second branch of this rule, that of the admission of parol evidence, to annex customary incidents. In that case it was held, that a custom for an away-going tenant to provide work and labour, tillage and sowing, and all materials for the same, in his away-going year, the landlord making him a reasonable compensation, is not excluded by an express written agreement between the landlord and tenant, which is consistent with such a custom. Now, here proof of the custom was considered as necessary to apply the contract to its proper subject matter. So in the two cases which we have supposed of the steamboat, and the ship; we think the extrinsic evidence which we have mentioned would be admissible, because the question would not have been the meaning of the stipulation to take proper care of the boat, in the one case, and to take the ship in the other, in the general sense of these expressions; but what was the meaning of proper care, as to that steamboat, and of the word take, as to that ship, under the circumstances which attended the respective contracts concerning them: neither a steamboat in the one case, nor a ship in the other, was the proper subject matter of the contract, but each of them, in connexion, with its accompanying circumstances; in other words, that steamboat, under the circumstances under which it was hired; and that ship, under the circumstances under which it was taken.

And so in the case before us, upon the same principle, the subject matter of the contract was not merely the steamboat Franklin, but the steamboat Franklin under the circumstances under which it was hired. The parol evidence then, in this case, was admissible; because without its aid, the written contract could not be applied to its proper subject matter: and, therefore, it was proper to prove the circumstances attending the transaction. Having thus stated our opinion to be, that evidence ought to have been received to prove the facts stated in the bill of exceptions on the part of the defendants; it follows as a consequence, that the Court below erred, in giving to the jury the instruction which they did give, at the instance of the plaintiffs in the Circuit Court.

We think, therefore, that the judgment is erroneous, and must be reversed with costs. And a venire facias de novo is awarded; with instructions, that upon the next trial, the Court shall receive parol evidence, to prove the facts stated in the bill of exceptions, to have been offered to be proved by the defendant, at the former trial: except the fact of the communication made to the plaintiff, by the defendant, or his agent, before the time of making the contract, that the defendant intended to keep the steamboat Franklin in use under the contract, so long as the navigation remained open, and no longer: and with the further instruction to the Court, not to give the jury the instruction stated in the exception to have been given at the former trial.

Mr. Justice THOMPSON.

I have not been able to concur in the opinion of a majority of the Court in this case. I admit, in the fullest extent, the rule, that parol evidence is admissible to explain a latent ambiguity. But I cannot perceive any ambiguity in the contract in this case, requiring the application of that rule. The contract is dated the 19th of November, 1831, and was for the hire of the steamboat Franklin, to be placed on the route from Washington to Potomac creek, until the Sydney should be placed on the route; and to commence on the day after the date of the contract, at the rate of thirty-five dollars per day, clear of all expenses, other than the wages of the captain, which were to be paid by the company. The only question in the case is, as to the admissibility of the parol evidence offered on the trial. I think it was properly rejected by the Court. Whatever related to any conversations, or negotiations on the subject, previous to the consummation of the contract, were merged in the final conclusion of the contract; according to the well-settled rule of law. And whatever passed between the parties, after the contract was concluded, was also inadmissible; because it tended to vary the contract, and substitute another for that which had been concluded between them. The contract was for the use of the Franklin, without any specified limitations as to time. It was to continue until the Sydney was placed on the route. The Sydney was owned by Mr. Bradley, and was at the time the contract was entered into, at Baltimore, for the purpose of being fitted with her engine, and other equipments necessary to complete her. The time, therefore, for which the Franklin was to be employed, depended entirely upon the Sydney's being placed upon the route. And this was at the election of Mr. Bradley: the boat was his, and the repairs or equipments were under his directions, and could not be hastened by the owners of the Franklin; and they had it not in their power, to put an end to the contract, but were bound to keep their boat ready for the use of Mr. Bradley, until the Sydney was placed on the route. It is not at all probable from the date of the contract, about the middle of November, that either party anticipated the freezing of the river so early as it did; or some provision would have been made in the contract for such event. The loss resulting from such an unexpected and temporary obstruction by the ice, ought to fall on the party who is chargeable with the delay in placing the Sydney on the route—and that was Mr. Bradley. The boat was his; and the placing her on the route was at his election, and of course at his risk.

Mr. Justice CATRON.

The contract given in evidence to sustain the action below is free from any ambiguity on its face; and the question is, can oral evidence be resorted to—first, to raise an ambiguity, by showing the objects of, and circumstances that lead to, the contract; and second, to explain the ambiguity created by the oral evidence?

[Bradley *vs.* The Washington, Alexandria, and Georgetown Steam Packet Company.]

I think no such ambiguity, by extrinsic and inferior evidence can be created, thereby to open the contract to explanations and additions inconsistent with its face.

Nor can oral evidence be called in to explain the ambiguity inferred from the circumstances and unexpressed intentions, in reference to which the parties are supposed to have contracted. Their entire meaning is taken to be in the writing. 3 Stark. Evid. 999, 1000.

By this means new and independent stipulations are sought, as I apprehend, to be added, dehors the written agreement, varying its terms plainly expressed; so that it may be made to operate different ways, according to the explanatory evidence. This case well illustrates the effect of the doctrine. Had the ice not closed the river, then Mr. Bradley would have had no excuse: this is matter of proof. Had the Sydney not been repaired, then he would have had no excuse: This is also matter of proof. Had the steamboat company established that they in previous winters took their boat, the Franklin, out of the Potomac, after the ice formed in this river, and run her in other waters, not subject to ice; and that Mr. Bradley prevented them from taking the usual course until the boat was frozen up in the river; then all equity and justice would have been on the side of the plaintiffs below. Hence the rights of the parties on another trial will not depend on the written contract; but it will operate according to the oral proof, and the conditions thus inserted into it. It is clear, the oral evidence, and not the writing, must produce the definite effect.

I hold, nothing can be added to a written agreement, unless there be a clear subsequent, independent agreement, varying the former; but not where it is matter passing at the same time with the written agreement.

Truly, where the terms of the written instrument are clear, oral evidence is used to point the application to this or that subject matter. It acts in aid of the written instrument, to give it the intended application; not to add to its terms, by inserting new conditions and limitations in the contemplation of the parties, and to be inferred from extrinsic circumstances, existing when the agreement was made.

To control its construction by oral proof of the objects of the contracting parties, and the purposes of the contract, would lead to the dangerous result of construing every writing not by its face, not by the language employed; but by matters extrinsic, variant in each case, as human testimony should make it: the construction, of necessity, to be determined by the jury, and not by the Court, whose usual province it is to construe written agreements.

The controlling extrinsic circumstance invoked as an element to construe the contract before the Court, is, that the boat Franklin was hired to carry the mail; and that so soon as the ice prevented her from running, it must be inferred the object of Mr. Bradley (at the date of the contract) was, to surrender the boat, and carry the mail

in stages.   As to this, the agreement is wholly silent, and the oral proof may contradict the assumption; if so, no ambiguity will be raised by the proof, as a foundation for further explanation.   Suppose it to be proved that the intention of the plaintiff in error was to carry passengers; and to have the entire transportation on the Potomac, at the opening and close of the session of Congress: and that he was willing to pay the price per day for the Franklin, for the sake of the monopoly, and the power to increase the fare;—that he bought out a rival, risking the chances of the season, and the number of passengers:   Or suppose it be proved that Mr. Bradley had (at the date of the agreement) taken his horses off of the stage line, and had no reliance to carry the mail but this boat—and that he designed to keep her until he supplied her place, even should the river close for a time.   In these events the written contract would be construed to mean, as the oral evidence proved Mr. Bradley intended when he made it.   He had the power to retain the Franklin as long as he chose to keep the Sydney out of the river; throughout the whole spring and summer of 1832—and may have so intended, had the winter been an open one, and the river not obstructed.

. If Mr. Bradley had the power to elect according to a reserved intention, and put an end to the agreement; so had the other side, on a similar reservation, not expressed, but to be inferred from circumstances existing at the time, and in reference to which the parties are supposed to have contracted.

I think no oral proof could be let in to raise an ambiguity, nor to explain it when raised; and that in this case, as in all others, the parties must abide by their agreement, fairly made, and plainly expressed.

Mr. Justice STORY.

I had not intended to express any dissent from the opinion of the Court in this case.   But as my silence might now, under the circumstances, lead to the conclusion that I concurred in that opinion, I wish to state that I concur in the opinions delivered by my Brothers, Catron and Thompson, and for the reasons given by them.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Columbia, holden in and for the county of Washington, and was argued by counsel:   On consideration whereof it is ordered and adjudged by this Court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs; and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to award a venire facias de novo.