## WILSON et al. v. W. R. GRACE & CO.

(Circuit Court of Appeals, Ninth Circuit. March 16, 1925. Rehearing Denied April 27, 1925.)

No. 4270.

**1. Evidence ⊜⇒460(2)—Parol evidence of negotiations held admissible to show matters included in settlement.**

Parol evidence respecting negotiations between the parties, resulting in a settlement, *held* admissible as showing what matters were included in the settlement.

**2. Compromise and settlement ⊜⇒23(3)—Settlement held to include all matters arising out of charter.**

A finding by the trial court that a settlement between owner and charterer, made after its termination, included all claims arising out of the charter, *held* supported by the evidence.

Appeal from the District Court of the United States for the Southern Division of the Northern District of California; Frank H. Rudkin, Judge.

Suit in admiralty by Henry Wilson and others, partners as Wilson Bros. & Co., against W. R. Grace & Co., a corporation. Decree for defendant, and libelants appeal. Affirmed.

Andros & Hengstler and Frederick W. Dorr, all of San Francisco, Cal., for appellants.

Goodfellow, Eells, Moore & Orrick, Stanley Moore, and George Herrington, all of San Francisco, Cal., for appellee.

Before GILBERT, HUNT, and MORROW, Circuit Judges.

MORROW, Circuit Judge. On December 21, 1915, the respondent, W. R. Grace & Co.,

a corporation, chartered from libelants, Wilson Bros. & Co., the steamship Columbia for a period of about one year, 10 per cent., more or less, at the rate of hire of $350 a day. The charter party contained the following provision, which is the subject of controversy in this case: "That all derelicts and salvage shall be for owners' and charterers' equal benefit."

On February 18, 1916, the Columbia was delivered to respondent, which would make the full charter period (one year, with the 10 per cent. added) expire on March 26, 1917, at 7 o'clock p. m. On February 24, 1917, the Columbia left Antofagasta, Chile, on her last voyage, and under normal conditions would have arrived at San Francisco on March 17, 1917, nine days before the expiration of the charter. But soon after the Columbia left Antofagasta it was found that the steamship Cuzco, also operated by respondent, had gone ashore at Salaverry, off the coast of Peru, with cargo aboard. Respondent thereupon ordered the Columbia to deviate from her regular voyage to San Francisco, proceed to Salaverry, and render all assistance possible to the Cuzco.

On March 1, 1917, the Columbia arrived at Salaverry, and stood by the Cuzco, but, having a towing line of only 200 fathoms in length, which was not long enough to reach the Cuzco, the Columbia was unable to do more than stand by, which that vessel did for 21 days 11 hours and 20 minutes. During that time the master of the Columbia tried several times to get a line on the Cuzco, but could not get close enough to reach her. The only other service the Columbia was engaged in during that time was in dragging for a lost anchor belonging to the Cuzco, but was unable to recover it. The result was the Columbia rendered no actual salvage service to the Cuzco, and the latter vessel was not floated until many months later.

On March 22, 1917, the Columbia left the Cuzco and proceeded on her voyage to San Francisco. On April 12, 1917, at 12:30 p. m. the Columbia was delivered to libelant, 16 days 17½ hours after the expiration of the charter period. Within a few days after the arrival of the Columbia at Salaverry to stand by the Cuzco, conferences were held in San Francisco between Gale H. Carter, of W. R. Grace & Co., the respondent, and A. B. Johnson, of Wilson Bros. & Co., the libelants, with respect to the return of the Columbia to San Francisco.

On October 20, 1916, Wilson Bros. & Co. sold the vessel to the Hammond Lumber Company for $425,000, the vessel to be de-

livered upon the expiration of the charter party. The vessel had cost Wilson Bros. & Co. $300,000 to build. When she reached San Francisco, they were anxious to close up their accounts with respect, to her and get whatever money was coming to them at that time. Grace & Co. had not received compensation for their expenses in maintaining the Columbia at Salaverry, and could not obtain reimbursement for such expenses until the general average of the Cuzco had been finally adjusted and settled. Wilson Bros. & Co. objected to waiting for the adjustment in the settlement of their account, and demanded immediate payment.

Under date of March 9, 1917, Wilson Bros. & Co. made demand upon Grace & Co. by letter for detention of the steamer Columbia at Salaverry, Peru, the sum of $3,000 for each and every day the vessel was so held. To this letter Grace & Co. replied, under date of March 10, 1917, stating that under the terms of the charter party the ultimate charter period was March 26th, and it was well established that for any period over and above the charter party period the owners were entitled to hire, according to the market at that time and at whatever the market rate should be. The letter stated that on March 26th Grace & Co. would be ready to pay for any time in excess of the charter period. For the information of Wilson Bros. & Co. the letter further stated that the charter market rate was between $9 and $10 per D. W. ton per month, from which Wilson Bros. & Co. could readily figure the market charter rate of the Columbia, which rate it was suggested would not likely vary much between March 10th and March 26th, the ultimate date of the charter.

Upon the trial of the case, A. B. Johnson, representing the libelants, and Gale H. Carter, representing the respondent, testified concerning the detention of the Columbia in standing by the Cuzco at Salaverry, and the negotiations leading up to the settlement of libelant's claim for such service. Johnson said he first heard about the Columbia having been diverted from her regular course to San Francisco about the 8th of March, from W. R. Grace & Co. They told the witness they had ordered the Columbia to stand by the steamer Cuzco to salve her. Witness says: .

"I objected, for the reason that we wanted to make delivery of the vessel within the time that we had agreed to in our sales contract. We wrote several letters to W. R. Grace & Co., objecting to the detention of the Columbia. The Hammond Lumber Com-

pany pressed us nearly every day about getting the vessel soon. The Hammond Lumber Company said they would hold us responsible for any damage they might be put to. Between March 26th and April 12th, when the Columbia was delivered, we arrived at the sum that was to be paid libelants in this way: Grace & Co. made a proposition that the market rate for the use of the Columbia, at that time was $26,000 a month, or $850 a day. We figured the vessel at 2,700 D. W. tons. We accepted the proposition for additional charter hire. In making this settlement, I was talking with Mr. Carter. We finally agreed upon $9.50 per ton. I asked Mr. Carter if there was any salvage coming, and he said the Columbia did not salve the vessel, so there was none collectible. I do not remember that Mr. Carter asked me whether libelants were willing to see what the salvage hire would be. We did not want the vessel to remain there and perform any salvage service. We asked that the vessel abandon any attempt at salvage and return to San Francisco, and that we be paid the sum of $3,000 a day. That was in my letter."

Gale H. Carter, vice president of W. R. Grace & Co., was a witness for the respondent, and testified concerning the conferences relating to the detention of the Columbia to stand by the Cuzco. Prior to the time of the payment to Wilson Bros. & Co., arising out of that detention, Carter testified that he had a conversation with Mr. Johnson concerning the cause of the detention. When Mr. Johnson heard that Grace & Co. had ordered the vessel into Salaverry to stand by the Cuzco, he demurred, and said that it might prejudice his sale of the vessel, and insisted that there was great probability of delay, which would bring the vessel beyond her ultimate charter date; and at that time the witness took up with the underwriters as to whether Grace & Co. could release the vessel, or whether it was proper—only proper—that Grace & Co. should keep her there, and also wait for the arrival of the Santa Alicia, another steamer of Grace & Co., which was bound by Salaverry.

The first notice that the witness got from Mr. Johnson was a letter demanding that for any additional time over the charter party period Grace & Co. should pay these owners $3,000 per day. which was far greater than any amount Grace & Co. had any idea of paying, and was really the basis of the start of Carter's negotiations with Mr. Johnson. They started from Johnson's original demand of $3,000 until they arrived at the

amount they finally settled for, which was about $850 a day. Concerning general average or salvage, Carter advised Mr. Johnson not to hold up Grace & Co. for a settlement at that time. Carter advised Mr. Johnson, or suggested to Mr. Johnson, that he leave this reimbursement, or rather the reimbursement which would accrue to the Columbia, to be recovered under the general average; but this he did not want to do, stating that he wanted the entire matter of the vessel settled at once.

On cross-examination Mr. Carter testified that during these conversations with Mr. Johnson between April 12th and April 24th, when they finally arrived at a settlement, he did not know they were going to receive $1,000 per day for the services rendered by the Columbia at Salaverry. He thought they would. He had been advised by Grace & Co.'s insurance brokers, Willcox, Peck & Hughes, that they thought that a charge of $1,000 a day for this ship would be accepted by the underwriters. Thereupon a telegram was introduced in evidence from Willcox, Peck & Hughes, in New York, to Willcox, Peck & Hughes, in San Francisco. This telegram is as follows:

"New York City, March 16, 1917.

"Cuzco. Some of the underwriters here on vessel and cargo have agreed to engagement Columbia at thousand dollars per day but several of the vessel underwriters refuse agree contending it is duty shipowners under sue labor clause to do whatever necessary and endeavor float vessel and that when adjustment comes before them they will then settle if shipowners action in hiring assistance seems to have been reasonable. Other vessel underwriters who have agreed to hiring Columbia give notice that if Cuzco is not floated within short time they will not agree to Columbia being kept indefinitely. Underwriters point out that the suggested price of thousand dollars per day to Columbia must be in full of any and all claims by her owners charterers master officers and crew underwriters idea being to bar claim by anyone for any further amount in respect to salvage services or otherwise."

The settlement that was made through Mr. Johnson, representing the libelants, was evidenced by a check of Grace & Co. on the First National Bank of San Francisco for $11,626.79 to the order of Wilson Bros. & Co. The check was accompanied with a statement, made up by W. R. Grace & Co., which recited, among other items, that it was "in settlement of account to date per our statement No. 2331 attached, $11,626.79, Co-

lumbia and owners." The statement credited Wilson Bros. & Co., by hire from 7 p. m. March 26, 1917, to 12:30 p. m. April 12, 1917, 16 days 17½ hours, at $25,650 per month, $13,842.12.

Following items of credit and debit there is this balance, $11,626.79, for which Grace & Co. issued and delivered their check to Wilson Bros. & Co. in settlement of account. Libelants charge in their libel that respondent received $24,305.54 from the underwriters of the Cuzco in general average; that this sum was for salvage services. They therefore bring suit for half of the amount, or $12,152.77, claiming the same under the terms of the charter party, providing "that all derelicts and salvage shall be for owners' and charterers' equal benefit."

Respondent admits that the interests of the Cuzco engaged the Columbia at the rate of $1,000 a day, and that respondent received $21,472 from the underwriters. Respondent claims, however, that the evidence shows that the expenses exceeded the amount received, and that the amount was a general average award, and not salvage, within the meaning of the charter party.

[1] The trial court found, as a fact, that all claims arising out of the charter party were included in the final settlement entered into between the parties on April 24, 1917, when respondent paid the libelants $11,626.-79 "in settlement of account." There is abundant evidence in the record to support this finding. It is objected that the oral evidence tending to support this finding was inadmissible under the parol evidence rule; the rule referred to being that, where the agreement has been reduced to writing, it cannot be added to or varied by parol evidence.

There is, however, another general rule found in section 1647 of the Civil Code of California, providing:

"A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."

In Jones on Evidence by Horwitz, § 453, it is said:

"Under some circumstances, not only the situation and relation of the parties, but their *acts, negotiations and statements,* may be proved as part of the surrounding facts which throw light on the transaction."

This rule was stated by the Supreme Court of the United States in Bradley v. Steam-Packet Co., 13 Pet. 89, 10 L. Ed. 72, and reaffirmed in United States v. Bethlehem Steel Co., 205 U. S. 105, 118, 27 S. Ct. 450, 51 L. Ed. 731, and Lowrey v. Hawaii,

206 U. S. 206, 221, 27 S. Ct. 622, 51 L. Ed. 1026.

[2] The testimony was admissible, and, being admitted, the court was justified in finding that all claims arising out of the charter party were included in the settlement of April 24, 1917, including the balance of $21,472 received by the respondent and paid to the libelants in general average award, and not as a salvage service within the contemplation of the charter party.

The decree of the District Court is affirmed.