Drake, Oh. J.,
delivered the opinion of the court:
Before proceeding to pass upon the merits of this case, there is a question to bo disposed of, which was reserved at the trial, viz, the admissibility as evidence for the claimants of the deposition of D. N. Cooley, which was objected to on the ground of his interest in the event of this suit.
The act of June 25, 1868, (15 Stat. L., 75,) provides, “That no plaintiff or claimant, or any person from or through whom any such plaintiff or claimant derives his alleged title, claim, or right against the United States, or any person interested in any such'title, claim, or right, shall be a competent witness in the Court of Claims in supporting any such title, claim, or *459 right, and no testimony given by such, plaintiff, claimant, or person shall be used.”
The closing prohibition here cannot be understood in a literal sense; for that would, in a case- like this, debar the court from using the only means presented of deciding the question of the interest of the witness, viz, the examination of his own declarations on that subject.
The meaning of the provision, as it seems to us, is, that the testimony of an interested witness shall not be used in supporting the claimant’s right to recover, but that the court may examine it to any extent to enable it to pass upon the question of his interest; just as, in courts where evidence is given orally, an offered witness may be examined to the same point upon his voir clire.
We have examined Cooley’s deposition and find that he declares that he had an understanding.with the contractors that he should share in the profits of the two contracts, one of which is the foundation of this suit.
This suit is to recover damages for the broach by the defendants of that contract; and the measure of damages claimed is the profits which Coryell •& Bowles would have made on said contract if they had been allowed to proceed with its execution according to their views of their rights under it.
It is very clear that if Cooley was to share in the profits of the contract, he is to share in any recovery had in this suit. His testimony, therefore, is incompetent, and, as to the merits of the case, has not been considered.
We now proceed to state our views of the case.
The claimants sue to recover damages, stated by them at $32,768, for alleged breach by the defendants of a contract entered into by the deceased, Thomas D. Coryell, and the claimant, Bowles, of the one part, and the Commissioner of the General Land-Office, of the other part, for the survey of a certain tract of land in the State of 'Kansas, twenty miles in width, known as the “ Osage trust-landsP
On the 18th day of September, 1866, two contracts for surveying within the limits of those “ trust-lands ” were made between those parties.
The first of those contracts is not involved in this suit.
By the second, Coryell & Bowles undertook ‘! to survey all township and section lines necessary to subdivide into sections *460 all that portion of the tract of land twenty miles in width off the north side of the Osage Indian reserve, in the southern part of the State of Nansas, ceded to the United States in trust as per Article II of the treaty with the Great and Little Osage Indians, dated September 29,1805, and not embraced in your contract of the 18th of September, 1800.”
The claimants allege a breach of this contract by the action of the defendants, through the Commissioner of the General Land-Office, in letting out, in May, 1807, a contract to one Samuel S. Smoot for surveying the part of the Osage trust-lands lying west of the Arkansas iiiver j which part the claimants insist was included in the contract with them upon which this suit is based. They sue for the profits they would have made upon the surveying of that part of the lauds if they had been allowed to perform the same.
On the other hand, the defendants contend that the contract sued on was not, in fact, intended by either party to cover any land lying west of the Arkansas Biver; but only so much of the said trust-lands as lay east of that river.
The controversy, therefore, grows out of the description in the contract of the subject-matter of it, as above given.
It will be observed that while the width of the tract is specified, there is nothing to indicate, even remotely or inferentially, its length.
Were there nothing in the contract to affect this description, it could be hardly questioned, however, that it would be held to apply to the whole body of land, whatever its length, ceded by the Osages to the United States, in trust, under Article II of said treaty.
But the “ special instructions ” which the Commissioner of the General Land-Office gives to contractors in such cases are by law (12 Stat. L., 409) a part of every such contract; and the entire contract, therefore, does not in any case of this description appear until those instructions appear, if such have been given. In this case such were given, and they are not only by law a part of the contract, but the contractors expressly bound themselves to observe and obey them.
Beferring, in the outset, to “ the Osage ceded lands, in trust, per Article II treaty of September 29, I860,” as the subject-matter of the two contracts of September IS, 1886, those instructions proceed to prescribe the method of the survey, and, *461 as a part of that method, direct the contractors to survey the northern line of the “Osage diminished lands5’ — which is also the southern line of the said ceded trust-lands — “ west to Arkansas Elver;55 thereby, apparently, indicating that river to the contractors as the western limit of the tract to be surveyed under those contracts.
This direction introduces an element of uncertainty into the contract which was not there before. The question at once arises, whether the parties intended the Ai bausas Eiver as the western limit of the lands to be surveyed, or whether they intended that the contractors should survey the whole of the trust-lauds, whatever might be their extent weatwardly.
The defendants claim the former; the claimants insist upon the latter. What is to decide between them "1 Plainly, resort must be had to extrinsic evidence to solve the difficulty. The whole theory of the claimants’ case makes such a resort necessary. They cannot take a single step .in support of their claim without invoking such evidence. Their case' assumes, as a fundamental fact, that the trust-lands extended west of the Arkansas Eiver; but the contract signed by the parties does not, directly or inferentially, say so, and the “special instructions” would seem to indicate otherwise.
Ilow, then, are they to prove this vital fact? Plainly, no otherwise than by extrinsic evidence.
On the other hand, the defendants claim that even if the tract did extend west of that river, (which-was not known to either party when the contract was signed,) it was not the intention of the parties to include in .the contract any land lying west of it, but only that lying east of it.
How is this to be established? ■ Plainly, no otherwise than by extrinsic evidence.
The gist of the case, then, is in the intention of the parties as to the westward extent of the tract; and that is not capable of determination from the contract and the “ special instructions,” taken by themselves; for the terms of the former do not indicate the westward extent at all; and the direction continued in the latter to survey the southern line “west to Arkansas Eiver,” while it apparently designates that as the western boundary, is not so entirely conclusive on that point as to control the interpretation of the contract and leave no uncertainty.
The case, then, is one in which it is proper to recur to the *462 principles of law which regulate the use of extrinsic evidence in the interpretation of written contracts.
It is an aucient and familiar rule of law, that extrinsic evidence cannot be admitted to contradict or vary the terms of a valid written contract.
It is, nevertheless, certain that some evidence from without must be admissible in the explanation and interpretation of every contract.
Hence it is a firmly settled doctrine, that as to the parties and' the subject-matter of a contract, extrinsic evidence may and must be received and used, if necessary to make them certain.
The appeal to extrinsic evidence here is not to contradict or vary the terms of the contract, but to ascertain what was the intention of the parties as to its subject-matter. To that end it is resorted to by both parties — the claimants first — and is not only admissible but indispensable. For it is a principle recognized and acted upon by all courts of justice, as a cardinal rule in the construction of all contracts, that the intention of the parties is to be inquired into, and, if not forbidden by law, is to be effectuated. (Bradley v. Packet Company, 13 Peters, 89.)
In such a case, what is to be the scope of the evidence '2 Must it be confined to the mere point of direct proof that this or that was the subject-matter intended by the parties ? In the case just cited, the Supreme Court directed attention to this precise point, and thus stated the rule applicable to such a case:
“All the cases which we have cited, in which extrinsic evidence has been received, and those which we have supposed, in which we think it would be admissible, proceed on one principle only, and can only be justified upon that principle, and that is this: that the rule which admits extrinsic evidence, for the purpose of applying a written contract to its proper subject-matter, extends beyond the mere designation of the thing upon which the contract operates, and embraces within its scope the circumstances under which the contract concerning the thing ivas made, when, without the aid of such extrinsic evidence, such application of the written contract to its proper subject-matter could not be made.”
At a later day the rule was thus stated in the House of Lords by Parke, B., in Shore v. Wilson, (9 Clark & Finnelly, 556:) “For the purpose of applying the instrument to the facts, and determining what passes by it, and who takes an interest under *463 it, every material fact that will enable tbe court to identify tbe person or thing mentioned in tbe instrument, and to place tbe court, whose province it is to declare tbe meaning of tbe words of tbe instrument, as near as may be in the situation of tbe parties to it, is admissible in evidence.”
And the doctrine as it now stands is thus summed up by Mr. Parsons:
“ Where does tbe law stop in- this endeavor to remove uncertainty? We answer, not until it is found that the contract must be set aside, and another one substituted, before certainty can be obtained. In other words, if the contract which the parties have made is incurably uncertain, the law will not or rather cannot enforce it; and will not, on the pretense of enforcing it, set up a diiferent but valid one in its stead. It will only declare such a supposed contract no contract at all, and will leave tbe parties to the mutual rights and obligations which may then exist between them. But, on the other band, tbe law will not pronounce a contract incurably uncertain, and therefore null, until it has cast upon it all the light to be gathered, either from a collation of all the words used, or from all contemporaneous facts which extrinsic testimony establishes. If these make the intention and meaning of tbe parties certain, it may still be an intention which the words cannot be made to express by any fair rendering. In this case also tbe contract is null, for it is tbe words, and not the intention without the words, that must prevail. But if, when tbe intention is thus ascertained, it is found that the words will fairly bear a construction which makes them express this intention, then the words will be so construed, and the contract, in this sense and with this interpretation, will be enforced as the contract which the parties have made.” (Parsons on Oont., 5th edition, pp. 561, 562.) ‘
In the light and with tbe guidance of these authorities, let us examine this ease, first stating the extrinsic evidence relied on by the claimants.
First, they resort to tbe words of cession contained in tbe treaty of September 29,1865, as follows-:
“The said tribe of Indians also hereby cede_to tbe United States a tract of land twenty miles in width; from north to south, off the north side of the remainder of their present reservation, and extending its entire length from east to west.”
As it is manifest that this does not throw any light upon the *464 question of the westward extent of the tract to be surveyed, they resort to the fact,, about which there is no dispute, that about eight months after the contract was signed, the Government ascertained and fixed the western limit of the tract at the one hundredth degree of west longitude, which is about one hundred and fifty miles west of the Arkansas River ; and they claim that when that was done, the contract, ex m termini, extended to that limit, and must be held to include the lands west of the Arkansas River.
But that is not the real question. The point is not whether the Arkansas River or the one hundredth degree of west longitude was the western limit of the tract, but what was the western limit intended by the parties; and that is to be determined, not by a fact coming into existence eight months after the contract was made, but by all the circumstances attending the formation of the contract, and indicating the intention of the parties. Let us now consider those circumstances.
Among them the position of Mr. Cooley in relation to the contract is conspicuous. It would seem impossible to look at the case without seeing him as its principal figure, and coming to the conclusion that his mind in the premises was the mind of Coryell & Bowles. Indeed, it seems that they were merely his instruments, to enter into a contract to which he, being Commissioner of Indian Affairs, could not openly become a party. Whether so or not, there does not seem to be ground for a reasonable doubt that his mind was their mind. Certain it is that there is no evidence of any difference of mind between him and them, but striking and accumulated evidence that they not only accorded with him, but made him, from first to last, their representative. A condensed statement of the facts will show this.
Coryell was a clerk in the Indian-Office, of which Cooley was the head; and Cooley recommended him and Bowles for the contract, in the profits of which, as had been shown, he, Cooley, was to have an interest; and under which he, at the time, advanced money to enable- the contractors to commence the work, as will, in a moment, appear.
His intimate relations with the parties and the transaction, extending to the supervision of details, is evinced by his signing the contract and the attendant bond, as a subscribing witness. We suppose it an unusual, if not unprecedented, thing *465 ibr the bead of one Bureau to subscribe as a witness a contract entered into by the bead of another Bureau.
Simultaneously with the signing of those papers, Coryell & Bowles executed to him an irrevocable power of attorney, authorizing him to receive and receipt for all moneys which should become due to them under the two contracts; which paper declares that he and others had advanced $2,000 to enable them to commence the work, and were to advance more,• and that the power of attorney was given to secure Cooley and the others for the advances so made and to be made.
So much for the antecedent and contemporaneous facts.
Subsequent but immediately connected facts are of the same character. The 11 special instructionsfrom the Commissioner of the General Land-Office to Coryell & Bowles, touching the survey, were transmitted to them through Cooley: and when the contract with Smoot was made, Cooley, without communicating with them, presented to the Secretary of the Interior a written protest against that contract, as a violation of their rights.
From all these facts we deduce identity of mind between Cooley and them. We have not been able to discover in the evidence any fact conflicting with that deduction.' We therefore treat the case as if he and they were one.
What, then, did he, and they through him, intend as to the subject-matter of the contract! Let this be gathered from all the circumstances now to be stated.
He was, as stated, Commissioner of'Indian Affairs. In his office were the original field-notes of a. survey of the northern boundary of the Osage lands, made by John C. McCoy in 1836, by order of the superintendent of Indian affairs at Saint Louis. The last entry in those field-notes was this: “ set a square post at high-water marie on east bank of Arkansas * * * as the termination of the survey of the north line of Osage lands.”
There is no evidence that Cooley knew anything of the geography of those lands, except what he derived from that survey, which was in his official custody. On the contrary, the evidence all points to that as the basis of his knowledge on that subject.
His letter in favor of Coryell & Bowles was accompanied with a diagram of the lands, upon which the Arkansas River teas laid doion as the toestern boundary, of the tract.
Moreover, in his letter he refers to the tract as 11 being twenty *466 miles in width by about one hundred miles east and west f and in Coryell & Bowles’s power of attorney to him, of even date with the contract, it is described as “ a strip of land * * about one hundred miles long by twenty in width.” It turns out that the part of it lying east of the Arkansas answers well that description of the length, being ninety-sis miles, fifty-eight chains, and seventy-eight links long, while the whole length of the tract, from its northeastern corner to its northwestern at the one hundredth degree of longitude, is a fraction over two hundred and forty-five miles.
Against these facts there is no countervailing evidence. They are all written down. Nothing rests upon oral testimony ; nothing is affected with infirmity or confusion of memory, or with conflicting views; all is plain, business-like, exact, and incontrovertible. In view of it, it would seem to be impossible to reach any other conclusion than that Cooley and his constituents, before and at the time the contract was signed, had in their minds no other western limit of the lands to be surveyed than the Arkansas River.
Turning to the other party to the contract, the Commissioner of the General Land-Office, we find that in 1859 his office had received from the Indian-Office copies- of the field-notes of McCoy’s survey ; that when the contract was signed the Government had not fixed, and, indeed, did not know, the position of the western limit of the Osage lands; that McCoy’s survey, so far as appears, was the only official information in the General Land-Office pointing to any western limit; that the contract immediately followed, if it was not the direct result of Cooley’s letter, describing the lands as “about one hundred miles east and westthat the diagram accompanying said letter indicated the Arkansas River as the western boundary of those lands; and that the Commissioner, in his “ special instructions” to Coryell & Bowles, directed them to survey the southern line of the tract “west to Arkansas River.”
In view of these facts we can reach no other conclusion than that the Arkansas River was in the mind of the Commissioner of the General Land-Office when the contract was signed, as the western limit of the tract to be surveyed.
It thus appears from the main circumstances preceding and contemporaneous with the signing of the contract, that on each *467 side Cue view was the same. Minor circumstances tend to tbe same conclusion.
In reference to the limitation of the time for the completion of the work, it was, beyond doubt, the subject of consideration and arrangement. Is it at all probable that Coryell & Bowles would have agreed to a definite period of time if they had not had in mind a definite extent of surface to be surveyed? Every presumption is, that if the tract was of unknown. and indefinite extent, they would have demanded an indefinite time, or the privilege of extending any fixed period in the contract.
Again, the bond given by the claimants for the fulfillment of this contract, taken in 'connection with averments in their petition, seems to us to show that when the contract was entered into and the bond given, neither party had in mind any work, to be done west of the Arkansas Elver. The bond was in the penal sum of $26,000, which is therein stated as “double the estimated amount which would be due by the United States to the said Thomas D. Coryell and Charles Emery Bowles on the completion of the survey named in the foregoing contract.”
From this it appears with certainty that both parties united in estimating the whole amount to be paid under this contract at $13,000; and yet the claimants aver in their petition that if they had been allowed to go on and survey the part of the trust-lands lying west of the Arkansas Elver, which Smoot surveyed, they would have been entitled to receive therefor the sum of $52,853, of which $32,768 would have been clear profit. That is to say, the survey west of that river would have brought them more than four times as much as they estimated they were to receive under the contract; and the clear profits of that survey would have been more than twice and a half that estimated amount. If there were no other view of the case, this, it seems to ns, would clearly prove that the idea of surveying west of the Arkansas was not, when the contract was signed, present to the mind of any of the parties in any form whatever.
Again, it is a singular feature of this case that the only statement of the length of the tract, made by either party in connection with the formation of this contract, was made by Cooley and his constituents. From the Commissioner there was nothing on that subject. As we have seen, Cooley’s letter to the Commissioner described the tract as “ about one hundred miles east and west;” and if was accompanied with a diagram to the *468 same effect. And in tbe power of attorney before referred to the tract is similarly described. These facts show that in interpreting the contract as we do, we are carrying into effect their own formally and distinctly expressed views of its subject-matter, against which no single expression on the other side has been found. In demanding that the contract, which they themselves indicated as extending over about one hundred miles, shall be construed as stretching over a distance of two hundred and forty-five miles, they repudiate their own words, and do violence to every fact in the case.
Finally, when the contract was signed, neither party knew whether any part of the Osage trust-lauds lay west of the Arkansas River; and it is, therefore, unreasonable to suppose that they intended to include anything west of that river. Parties may contract with reference to a thing of whose existence they have knowledge, but of whose quantity they are uninformed; but to claim that a contract includes a thing of whose very existence all the parties were ignorant, is an absurdity.
It is needless to press conclusions farther, though more might be said. Every fact in the case indicates the intention of both parties that the Arkansas River should be the western limit of the land to be surveyed under those contracts. We therefore hold that to be the contract which they made. It is consistent with the words of the written contract, which -may fairly be construed as expressing this intention. Any other view would reject every material fact in the case, and all just legal deductions from those facts. .
The claimants’ petition is dismissed.