# IN GENERAL TERM, 1874.

VOLNEY Q. IRWIN AND JEREMIAH H. WILLIAMS *v.* BENJAMIN
E. SMITH AND DILLARD RICKETS, Appellants.

CONTRACT—*construction of.*

Where an expression in a written contract is of donbtful meaning, or is
capable of different constructions, and in the performance of the con-
tract the parties have mutually acted on a given construction, or one
of the parties has knowingly acquiesced in a construction given by the
other, and the acquiescing party has received benefits that would not
have been conceded to him if a different construction had been insisted
on, the construction thus given to the contract by the parties must
govern in case of a suit upon the contract.

*McDonald & Butler*, for appellants.
*James Buchanan*, for appellee.

NEWCOMB, J.—The defendants, with divers other parties
not served with process in this case, were a firm of railroad
contractors, under the partnership name of B. E. Smith and
associates; and, as such, contracted with the proper railroad
cempany to construct the Indianapolis, Bloomington, and
Western Railway. The plaintiffs took a contract from B.
E. Smith and associates, to grade a portion of said railway,
according to certain specifications annexed to the contract.
This suit was brought to recover compensation for work
alleged to have been done under that sub-contract. There
was a jury trial at Special Term, which resulted in a verdict
of $11,549.28, in favor of the plaintiffs. The defendants
moved for a new trial. The motion was overruled, and

judgment entered on the verdict, from which judgment the defendants appealed to the General Term.   The question in the case arises on the construction to be given to a clause of the contract relative to earth excavated from "borrowing pits" to construct embankments.   In the specifications, to which reference is made in the contract, is this clause :

" All material will be measured in excavation only, whether taken from the cuts upon the line, or from ditches and borrowing pits to form embankments, and no allowances of haul will be made unless the material excavated is required to be taken beyond the limits of the section upon which it is found."   Of the lengthy contract the following are the additional provisions that have any importance in the case.

" The earth from the excavations shall form the embankment as far as the Engineer of said railway shall direct, and the surplus earth shall be distributed so as to widen the embankment uniformly, or formed into spoil banks at such places as the Engineer of said railway shall direct, with evenness and regularity.

" When the excavations do not furnish materials sufficient to make the embankments, the deficiency shall be made up by widening the excavations uniformly, or by borrowing from such points as the Engineer shall designate, which shall be estimated and allowed as excavation."

" The Engineer of said railway shall estimate the work done by the party of the first part—Irwin and Williams— "under the contract, and the value of any extra work not herein provided for, and the estimates so made shall be final and conclusive between the parties."

" And the said party of the second part does hereby consent and agree to pay to the said party of the first part, in manner hereinafter mentioned, for the work agreed by this contract to be done as follows :   *   *   *   *   *   *   For earth excavation and grubbing, and clearing, fifteen cents per cubic

yard; and for embankment, including the grubbing and clearing, twenty-four cents per cubic yard. * * * And it is further agreed, that in case any dispute, or differences, shall arise between the said parties as to the construction, or true meaning and intent of this agreement, or the sufficiency of the performance of said work, that such disputes, and differences shall be considered and decided by the Chief Engineer for the time being of said railway, whose determination shall be final and conclusive between the parties, and said parties do hereby submit all and singular the premises, to the award, arbitration, and decision of said Chief Engineer, and agree that the same shall be final and conclusive between them to all intents and purposes whatsoever. And it is further agreed, that the submission to said Chief Engineer, touching all matters herein contained, agreed to be submitted to him, shall be deemed, considered, and taken as an essential part of this agreement, and not revocable by either of the parties hereto."

The question presented by the appeal is, whether the plaintiffs were entitled to fifteen cents per cubic yard for earth excavated from borrowing pits, for the purpose of making embankments, or whether their pay should, for such earth, be limited to the price agreed upon for embankment.

If the plaintiffs are entitled to be paid for earth from the borrowing pits, both as excavation and embankment, the verdict was right; otherwise it cannot be sustained.

It was stipulated in the contract, that monthly approximate estimates of the work done by the plaintiffs, should be made by the Engineer in charge, and that within ten days thereafter such estimates should be paid by B. E. Smith and associates, less twenty per cent. which they were entitled to hold until the completion of the work.

The plaintiffs claim that the words, " which shall be estimated and allowed as excavation," mean that all dirt taken

from borrowing pits shall be paid for as excavation at fifteen cents per cubic yard, and paid for again as embankment at twenty-four cents per yard. The defendants, on the contrary, insist that these words only prescribe a rule of measurement; that they are but a repetition, in different language, of the rule of measurement defined in the specifications, and have no reference to compensation. The Judge who presided at Special Term, adopted the construction claimed by the plaintffs, and instructed the jury, after reciting the clauses of the contract in reference to excavations, embankments, borrowing pits, and the rates of compensation provided for the different classes of work, as follows : " Under these provisions the excavating of the deficient material spoken of in the first clause quoted," (concerning borrowing pits) " is to be paid for at fifteen cents per cubic yard, as well as the excavation in the line of the road ; but before the plaintiffs can recover for such deficiency, they must use all the excavations in the line, or prism of the road, on any section, to make the embankment in such section, unless the Chief Engineer of the railroad company, having the road in charge, permitted the plaintiffs to waste in spoil banks, excavation in the line, or prism of the road on such section, and to borrow the deficiency."

It was conceded in the argument, and the evidence shows, that except as to a few yards of embankment, the verdict was rendered solely for earth taken from borrowing pits to construct embankment, at fifteen cents per yard for the excavation thereof, it having been paid for as embankment at twenty-four cents per yard, and which was not carried into the monthly estimates, nor the final estimate, as excavation.

Evidence was admitted on the trial, over the plaintiffs objections, tending to show that the parties, during the progress of the work, each construed that part of the contract relating to deficient material taken from borrowing pits, as not

entitling the plaintiffs to payment therefor as excavation, but as simply establishing a rule by which the quantity of earth to be taken for embankment should be measured and estimated as to quantity. The instruction from which we have quoted withdrew this evidence from the jury, and required them to find in the plaintiffs favor for this deficient material as excavation, at fifteen cents per cubic yard. We think it by no means clear that the construction given the contract by the Judge at Special Term was correct, construed by its own terms, for these reasons:

1st. If the intention of the parties was, that the contractors should receive thirty-nine cents for each yard of embankment, whether taken from cuts in the line of road, or from borrowing pits, they could have so expressed themselves in the contract in fewer, and more perspicuous words than those used, by simply providing that for every yard put in embankments thirty-nine cents should be paid, and for all material from cuts, wasted in spoil banks, fifteen cents should be paid.

2d. That when the parties intended to express the idea of payment, they used apt and unmistakable words to express their meaning, for example, this provision: " That excavations, and embankments for road crossings shall be made of such dimensions, and form, as shall be directed by said Engineer, and estimated *and paid for*, at the same price per cubic yard as other work on the sections."

3d. The word " estimate" is used in the contract indifferently as a measure of quantity, as well as of value. For instance, the contract provides that, " The Engineer of said railway shall estimate the *work done* by the party of the first part under this contract, and the *value* of any extra work not herein provided for, and the estimates so made shall be final, and conclusive between the parties." In the first clause of this sentence the word " estimate " evidently means to

measure, or determine; in the second, to do that, and also fix a value on the work after its quantity is so determined.

It seems to us that the controverted phrase "estimated and allowed as excavation," is reasonably susceptible of more than one construction, and in such cases extrinsic circumstances, and especially the actions of the parties under the contract, may be shown to aid in arriving at the proper construction.

In other words, the Court will, in such cases, place itself, in regard to the surrounding circumstances, as nearly as possible in the situation of the party whose written language is to be interpreted. *Simpkins* v. *Oakley*, 1 *Blackf.*, 537; *Bates* v. *DeHaven*, 10 *Ind.*, 319; 2 *Parsons on Contracts*, 564; *Bradley* v. *The Steam Packet Co.*, 13 *Peters*, 89; 1 *Greenleaf on Evidence*, § 295.

The extrinsic evidence introduced by the defendant was directed to these two propositions, viz: that there was a mutual, and *agreed* understanding between Alexander, the Chief Engineer in charge of the work, and the plaintiffs, that this now disputed clause did not entitle them to pay as excavation for dirt taken from borrowing pits, and that because of such mutual construction, Alexander permitted the plaintiffs to waste, in large quantities, material taken out of cuts in the prism of the road, which was paid for as excavation, when it was more profitable for the plaintiffs to do so, and to supply the deficiency caused by such waste, by taking material from borrowing pits along side the line of embankment.

2. That Alexander acted from the beginning of the work on the construction of the contract now asserted by the defendants; that the plaintiffs knew he so construed the contract, and because of such construction he permitted them to waste excavated earth at pleasure, and that they made no objection to his construction until after the completion of

the work and the final estimate, and after they had secured the full benefit of Alexander's construction by being allowed to waste and borrow material as they deemed most to their interest.

The answers of the jury to interrogatories show that they found there was no express agreement, or understanding between Alexander and the plaintiffs as to the construction of this clause of the contract, and as the evidence on that point was conflicting, we are bound by the decision of the jury. But the evidence does show, and on this proposition we are unable to discover any conflict in the testimony, that Alexander did construe the contract as not providing for payment as excavation of deficient material taken from borrowing pits; that in consequence of this construction he permitted the plaintiffs to waste earth that he might have required them to put into embankments at heavy expense; that the plaintiffs knew soon after the work was commenced that such was his construction; that they made no objection to it until after the work was completed, and they had received all the benefit that could accrue to them by permission to waste earth taken from excavations.

On these points Alexander testified as follows: " As to the measuring I construed the contract to mean that it had to be measured in excavation—that was the plain English of it—and that all of the material that went into the banks was to be paid for at twenty-four cents a yard, and all the material that was taken out of the cuts in the road bed was to be paid for at fifteen cents a yard. The measurement of what went into the banks was to be measured in excavation, and the banks were not to be measured."

*Question by defendants.*—" What was the construction with regard to the estimate of earth that was taken for the purpose of finishing out embankments, when the cut did not make the embankment—borrowing pits ?"

*Answer.*—" My construction was that I had authority to direct in regard to that matter; if it was a material thing for the railroad company, or to the general contractors, B. E. Smith and associates, I had a right to direct Mr. Irwin what to do in cases where it interfered with their rights; but in general I was not to interfere with Irwin and Williams in borrowing and wasting; they were to do as they pleased in that matter, except in rare instances. The construction was, that it did not affect anybody's interest, whether they borrowed or wasted, or not; and consequently, at Mr. Irwin's suggestion, and solicitation, he was allowed to do as he pleased about that. He stated (and I agreed to it) that it did not affect anybodys interest whether they borrowed a bank here, and wasted a cut there, or not. The construction was, that the earth taken out of borrowing pits should be measured in the natural bed in which nature left it, and that if it went into a bank (which of course it did) it was to be paid for at twenty-four cents a yard. The measurement was governed by the bed from which the dirt came, but the payment was to be governed by what was done with it. What was taken out of the cuts in the road bed, and thrown away, or put into banks either, was to be paid for at fifteen cents a yard, as to the taking of it out, and of course, if it was put into banks, they would not be under the necessity of borrowing dirt to put into that bank, and there would be no borrowing pit to measure."

*Question.*—" What knowledge had Irwin and Williams of your construction of that contract?"

*Answer.*—" They had a perfect knowledge of it from the beginning. I would like to state further, that in regard to this construction I consulted with Mr. Irwin, and had a perfect agreement, and understanding. That was the construction, and intention invariably on all these points."

19

*Question.*—" What knowledge, if any, had Mr. Williams of your construction of the contract ?"

*Answer.*—"A perfect and complete knowledge of the whole thing—it was talked over frequently."

*Question.*—" What objection, if any, or acceptance, was made of your construction of it by Irwin and Williams ?"

*Answer.*—" They accepted it."

Irwin and Williams each testified that they had no under-standing or agreement with Alexander in reference to such construction of the contract, and that they did not accept it. It becomes important, therefore, to consider the acts of the plaintiffs during the performance of the contract, and their silence under circumstances where good faith required them to object, if such circumstances existed.

There is no essential disagreement between the testimony of Alexander and the plaintiffs as to the fact that the former indulged the latter in wasting, and borrowing earth at pleas-ure, and the evidence shows that the plaintiffs derived sub-stantial benefits thereby. We give a few examples. On section 21 the final estimate shows excavation 16,450 yards ; embankment, 13,948 yards. Irwin testified in regard to this section, as follows : " The bulk of the excavation was wasted there, it was all in one cut and at the east end of the section. There was a large cut at the east end, and a little cut, and close to that was a tressel; beyond the cut it was all bor-rowed clear through. There was an old grade there, built fifteen, or sixteen years ago, but the great bulk of the earth in that section was borrowed, because we would have had to haul the excavation three-fourths of a mile to put it into a bank."

By the terms of the contract the Engineer had power to compel the plaintiffs to make the embankment of a given section from the earth excavated on such section. Had he done so on this section alone, the claim of the plaintiffs on

which the verdict was obtained would have been nearly $2,000 less.

On section 22, Irwin testified, there were from 3,000 to 4,000 yards of earth wasted, and about 10,000 yards of fill. The estimate for secrion 25, shows of excavation 2,835 yards of embankment 5,285 yards. Irwin testified that the cut in that section was at the west end, and the earth taken from it was all wasted.

We now proceed to the inquiry, did Irwin and Williams know while they were taking advantage of Alexander's indulgence as to waste, that he construed the contract as not providing for payment as excavation of earth taken from borrowing pits, and did they acquiesce in such construction?

These facts are shown by the evidence:

1. Irwin and Williams examined the profile of the road before entering into the contract. This profile showed that there would be a large excess of embankment over excavation on the sections on which they bid.

2. Monthly approximate estimates of the amount of the two classes of work were made, and delivered to the plaintiffs during the progress of the work, on which they drew pay in accordance with the estimates.

3. Every monthly estimate, commencing with the month of November, 1869, and ending with the month of September, 1870, showed upon its face that no allowance for payment was made for material taken from borrowing pits; because they all showed much larger quantities of embankment than excavation.

4. Irwin and Williams knew that payment was not being made for borrowing pits, as the estimates were placed in their hands from ten to fifteen days prior to the monthly payments, and they could not help seeing that they were not being paid for borrowing pit excavations; and in addition to this we have the testimony of Irwin that his attention was specially

directed to the character of the estimates.   In his cross-examination we find the following :

*Question.*—" Do you swear that Mr. Alexander did not explain any estimates to you ?"

*Answer.*—" What do you mean by explaining an estimate ?"

" Showing you the amount of work you had done, where it was, what sections it was on, and the amount of yards of excavation and embankment."

*Answer.*—" He did that every month except August.   I do not think he gave us any statement for August."

As a specimen of the form of monthly estimates, we copy from the bill of exceptions the one for January, 1870 :

Estimate for January, 1870, Irwin and Williams :

| Section 19, | 3,191 ex. | 8,461 em. |
| " 17, | 740 " | 5,376 " |
| " 18, | 10,354 " | 16,124 " |
| " 19, | 199 " | 876 " |
| " 21, | 7,086 " | 3,375 " |
| " 22, | 3,022 " | 12,055 " |
| | 24,592 | 46,267 |

24,592 cu. yds. ex. at 15 cts............3,688 80
42,267 cu. yds. em. at 24 cts.......$11,104 08

$14,792 88
Less 20 per cent............   2,958 57

$11,834 31
Former payments...........   8,092 23

$3,742 08

This estimate shows an excess of embankment of nearly one hundred per cent.; every other estimate shows a large excess of embankment, and the final estimate made the total

work, excavation 159,261 yards; embankment, 206,645 yards.

There is no evidence that Irwin and Williams, or either of them, at any time during the progress of the work, objected to the estimates on the ground, that borrowed earth was not being paid for as excavation, or that they claimed it should be so paid for; and it is a suggestive circumstance that on several occasions when short of money they borrowed of the paymaster of the road, at 12 per cent interest, when if their present claims were well founded, they had a right to demand of the defendants an amount much in excess of the sums borrowed, and they made no such demand.

From these facts the conclusion is irresistible, that, while there may have been no formal agreement, or understanding between Alexander and the plaintiffs, that the contract did not give the latter 15 cents per yard for borrow pit excavation, both parties acted on that construction, and that for that reason Alexander granted the plaintiffs privileges, that he would not otherwise have granted, and which he could not have granted without a gross violation of his duty to the other contracting parties.

It was said by the Supreme Court in *Bates* v. *DeHaven*, 10 *Ind.*, 322, that " evidence of the mutual acts of the parties in reference to the fulfilment of the contract after it was entered into, was properly admitted to show what their intention and understanding was in the use of language otherwise somewhat obscure.

We think that on the facts appearing in the record, the Judge trying this cause erred in instructing the jury that the plaintiffs were entitled to pay at the rate of fifteen cents per yard for earth excavated from borrowing pits.

It is insisted, however, by the counsel for the plaintiffs, that the error, if any there was in this instruction, was cured by the 19th instruction. That instruction recites the clause of the contract empowering the Engineer to settle its construction in cases of dispute, and proceeds as follows:

" This clause of the contract is binding upon the plaintiffs. It is a part of the contract they deliberately entered into ; it is supported by a valid consideration ; they will not be permitted to disregard it."

If therefore you, gentlemen of the jury, find from the evidence that James B. Alexander was the Chief Engineer of this Railway Company, during the time of the construction of that part of the railway which included plaintiffs' work, and if you find from the evidence that questions arose calling for a construction of said contract, that said Alexander as said Engineer, did put a construction upon said contract, and if you further find from the evidence, that these plaintiffs and defendants, with a full knowledge of all the facts, and with a full knowledge of the construction put upon said contract by said Engineer, did accept, consent to, and agree with the, construction so put upon said contract by said Engineer, then I instruct you that the plaintiffs are bound by the construction put upon said contract by said Engineer ; and if your further find that said Engineer honestly and correctly estimated, and measured the work done by plaintiffs under said contract, and in accordance with the construction thereof as agreed to by the plaintiffs, and defendants, and that plaintiffs have been paid for said work done by them, then it will be your duty to find for the defendants. But if you find the said Engineer did not honestly, or correctly estimate, and measure the work, and that defendants have not paid for all the work at the contract price, actually done, then you should find for the plaintiffs."

This instruction is predicated on the hypothesis that a question of construction had arisen between the parties, calling for an authoritative decision by the Engineer ; that a construction was given by the Engineer, and that with full knowledge thereof, the plaintiffs did accept, consent to, and agree with the construction so given by the Engineer to the contract.

Irwin, and Williams *v.* Smith, and Rickets.

The jury must have understood from this instruction that to absolve the defendants from liability, there must have been a dispute, or controversy, as to the construction of the contract, and that the Engineer decided between the parties. In fact, there was no controversy, or question; both parties acted on the same construction, and the jury were not instructed as to the conclusions that might be drawn from the acts, or silence of the plaintiffs, with knowledge of the construction given to the contract by Alexander. We think it more than probable also, that the jury may have understood the closing paragraph of the instruction as requiring them to give the plaintiffs a verdict for all excavation actually done, notwithstanding the adverse construction of the Chief Engineer, and we think that they must have so understood it, unless they should find that there had been an actual dispute, and a formal construction of the contract by the Engineer in consequence thereof.

We hold that the uncontroverted evidence shows that the contract was construed by each of the parties while the work was in progress; by Alexander expressly, and by the plaintiffs tacitly, as manifested by their acts and silence as above stated; that the construction of each was the same as that claimed by the defendants at the trial, and that such construction having been mutually acted upon must be held to be the proper and true construction.

The bill of exceptions shows, that at the time of the final estimate, Irwin and Williams disputed the accuracy of measurements of their work; but there is no evidence whatever that they then, or previously claimed that they should be paid for excavating borrowing pits. Their complaints went to the measurement of the embankments, and excavations in the line of road, as we understand the evidence.

The judgment at Special Term is reversed, with instructions to grant the defendants a new trial.